## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re                                     :   Chapter 11
:
PEREGRINE I, LLC,[1]             :   Case No. 11-11230 (MFW)
:
       Debtor.              :
:
---------------------------------------------------------------x

### EMERGENCY MOTION TO AUTHORIZE (I) CRITICAL PAYMENT TO FOREIGN OPERATOR AND (II) CONSENSUAL USE OF CASH COLLATERAL TO MAKE SUCH PAYMENT

The above-captioned debtor and debtor-in-possession (the "Debtor") moves for entry of an order, substantially in the form attached hereto as Exhibit A, authorizing (a) the Debtor to make a $3.145 million payment to Etesco Drilling Company B.V. ("Etesco"), the operator of the Vessel (as herein defined) and (b) consensual use of cash collateral to make such payments. In support of this Motion, the Debtor respectfully states as follows:

### JURISDICTION

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 363 and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

---

[1] The last four digits of the Debtor's taxpayer identification number are 7108. The address of the Debtor is Maples Corporate Services Limited, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

## BACKGROUND

### A. The Chapter 11 Case

2. On April 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in this Chapter 11 Case.

### B. Overview of the Debtor's Business

3. The Debtor, a Delaware limited liability company, owns an oil drilling vessel named Peregrine I under official number 731983, flying the flag of, and registered in, the Bahamas (the "Vessel"). Rather than managing its operations itself, the Debtor has contracted its day-to-day management out to certain third parties. The Debtor's manager is PE-Cayman Inc. ("PE-Cayman"), which manages the Debtor pursuant to a Management Services Agreement (the "MSA"), dated November 19, 2009, between the Debtor and PE-Cayman. PE-Cayman subcontracts certain administrative services to Purenergy Management Services, LLC ("Purenergy") pursuant to a Subcontract for Administrative Services, also dated November 19, 2009, between PE-Cayman and Purenergy. Purenergy's obligations under the Subcontract for Administrative Services include maintenance of the Debtor's books and records, providing annual budgeting services, preparing annual financial statements and otherwise complying with PE-Cayman's obligations under the MSA.

4. The Debtor also contracts with an independent, non-affiliated third party, Etesco Drilling Company B.V. ("Etesco"),[2] for the day-to-day operation of the Vessel pursuant to an Operating Agreement, dated November 16, 2007 (as amended, the "Operating

NY\1803495.2RLF1 3991728v. 2

Agreement"), between the Debtor and Etesco. Etesco, in turn, has entered into two agreements with Petroleo Brasileiro S.A. ("Petrobras"), a charter contract (the "Petrobras Charter") and a services agreement (the "Petrobras Services Agreement"), pursuant to which Petrobras pays Etesco a fee for chartering the Vessel and certain additional amounts to cover operating expenses. All amounts due to Etesco under the Petrobras Charter, minus a small portion set aside for operating expenses, are delivered directly into a "lockbox" for the benefit of the Debtor's Prepetition Lenders (as defined below). 100% of the revenues of the Vessel is generated from the Petrobras Charter.

5. In summary, the Debtor is the owner of the Vessel but neither manages nor is in charge of the day-to-day operations of the Vessel. PE-Cayman and Purenergy manage the Debtor, while Etesco operates the Vessel. The Debtor itself has no employees; the employees that staff and secure the Vessel all work for Etesco, with 100% of the Debtor's revenues arising from the Petrobras Charter between Etesco and Petrobras.

## C.    The Debtor's Prepetition Capital Structure

6. Prepetition Credit Facility. The Debtor is a borrower under a $258,750,000 term loan credit facility (the "Prepetition Facility") pursuant to a Facilities Agreement, dated November 19, 2007 (as amended, the "Prepetition Credit Agreement"), by and among the Debtor, as the borrower, WestLB AG, New York Branch, as Agent and Security Trustee (the "Prepetition Security Trustee"), and the lenders party thereto from time to time (the "Prepetition Lenders"). The Prepetition Facility is secured by security interests in and liens on (the "Prepetition Liens") substantially all of the Debtor's existing and after-acquired assets, including the Vessel, which is the principal asset of the Debtor (collectively, the "Prepetition

---

[2] Etesco is not an affiliate of the Debtor or of Purenergy.

NY\1803495.2RLF1 3991728v. 2

Collateral"). As of the Petition Date, there was approximately $189,973,592 outstanding principal balance, plus accrued interest and swap claim amounts, under the Prepetition Facility (the "Prepetition Obligations"). The Debtor believes the value of the Vessel is less than the amount of the Prepetition Obligations.

**D.     Events Leading to the Debtor's Bankruptcy Filing**

7.      Shortly after the Vessel was acquired by the Debtor in 2007, certain mechanical issues arose that threatened the operation of the Vessel and impaired its ability to operate under the Petrobras Charter. After being repaired, the Vessel was returned to active drilling off the coast of Brazil. Recently, however, additional operational issues related to the Vessel's thrusters have arisen and have required Etesco to take the Vessel off-line. As 100% of the Debtor's ability to service the Prepetition Obligations comes from amounts that it receives from payments made by Petrobras under the Petrobras Charter, the Debtor soon found itself unable to service the Prepetition Facility.

8.      Prior to the Petition Date, the Debtor was unable to obtain additional financing or investments to bring the Vessel back into operation. Etesco had also threatened to terminate the Operating Agreement as of April 26, 2011. Thus, facing both financial distress and demands from Etesco, the Debtor filed this Chapter 11 Case on the Petition Date.

**E.     Etesco**

9.      Etesco has made a claim against the Debtor of approximately $6 million (the "Etesco Claim") pursuant to the Operating Agreement. The Debtor is unable to determine whether the Etesco Claim is on account of amounts accrued pre-petition, post-petition or both.

NY\1803495.2RLF1 3991728v. 2

10.      Following the Petition Date, Etesco informed the Debtor that unless the Debtor pays approximately \$3.145[3] million of the Etesco Claim by Friday, April 29, 2011 in order for Etesco to meet certain payroll obligations of its employees, Etesco will purport to terminate the Operating Agreement.[4]    The consequences of termination of the Operating Agreement are severe.  First, because the staff of the Vessel are Etesco employees, and Etesco will remove its employees from the Vessel upon termination of the Operating Agreement (or if their wages are unpaid, the employees may simply refuse to work altogether regardless of whether the Operating Agreement is terminated), the Vessel could be completely unstaffed.  If the Vessel is unstaffed, it will automatically be in violation of Brazilian law, requiring it to be docked immediately.  Once that happens, the Vessel would not be secure and will be vulnerable to attack or theft.

11.      Even if the Vessel is not stolen, pillaged or damaged, termination of the Operating Agreement will cause significant economic damage to the Debtor because it almost certainly will lead to termination of the Petrobras Charter and the Petrobras Services Agreement. Because revenues derived under the Petrobras Charter are the sole source of income for the Debtor, termination of the agreements with Petrobras would completely destroy any possibility of reorganization of the Debtor, and would dramatically reduce any recoveries for creditors in a going-concern sale or liquidation.  The Debtor would also be required to immediately remove the Vessel from Brazilian territory following termination of the Petrobras Charter but would have no employees to staff and steer the Vessel.

---

[3] Etesco originally demanded the entire \$6 million be paid, but the Debtor proposes to pay only \$3.145 million, which upon information and belief will be sufficient to avoid Etesco attempting to terminate immediately.

[4] The Operating Agreement is governed by Brazil law and Etesco is a Brazil corporation.  While the contract is executory, Etesco contends that it nevertheless may terminate the contract because it is governed by Brazil law and this certainly would not be decided on a contested basis by tomorrow.

NY\1803495.2RLF1 3991728v. 2

12.     The Prepetition Lenders, who are materially undersecured, have consented to the use of their cash collateral to make the requested payments on account of the Etesco Claim. In fact, the Prepetition Security Trustee has specifically requested that the Debtor make or authorize the $3.145 million payment in order to protect their collateral (the Vessel) from the consequences described above.

13.     Further, the Debtor believes it only has twenty-two creditors. The Debtor requests that the Court take judicial notice that the top twenty creditor list, filed with the its petition, shows that the top eight of the twenty-two unsecured creditors are the Prepetition Lenders and the unsecured creditor holding the ninth largest claim is Etesco. The eleventh largest creditor is the manager, Purenergy, who also supports the Motion. The remaining unsecured creditors are each owed minimal amounts as compared to the amounts owed to the Prepetition Lenders: the Debtor believes the total other unsecured claims aggregate to be less than $1,500,000.

## RELIEF REQUESTED

14.     By this Motion, the Debtor seeks authority (a) to make a $3.145 million payment to Etesco in order to prevent termination of the Operating Agreement, and (b) for consensual use of cash collateral to make such payment. Payment of the requested portion of the Etesco Claim is necessary for the Debtor to maintain the Vessel, its sole asset.

## BASIS FOR RELIEF

### A.     No Authority Is Required to Pay Post-Petition Claims

15.     As set forth above, the Debtor is unsure whether the Etesco Claim is a pre-petition or a post-petition claim or some combination. To the extent that the Etesco Claim indeed is a post-petition claim, the Debtor is not required to seek authority to pay the Etesco Claim because it would be claim for an actual and necessary cost and expense of preserving the

NY\1803495.2RLF1 3991728v. 2

estate that would be paid in the ordinary course of business -- a payment under a contract to a third party.

**B.     Ample Authority Exists to Support Payment of Pre-Petition Claims Pursuant to its Sound Business Judgment and Under "Necessity of Payment" Doctrine**

16.     In an abundance of caution, however, to the extent that all or part of the Etesco Claim is a pre-petition claim, the Debtor seeks authority to satisfy and pay the Etesco Claim pursuant to its sound business judgment and under the "necessity of payment" doctrine.

17.     Courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of prepetition wages); see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).

18.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

NY\1803495.2RLF1 3991728v.2

19.     The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C.&S.W.R. Co., 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century. See Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where alternative was cessation of operations).

20.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. (stating courts may authorize payment of pre-petition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Central Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824-845 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay pre-petition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same); In re Motor Coach Industries International, Inc., 2009 WL 330993 (D. Del. Feb. 10, 2009) (denying a stay pending appeal on the grounds that there is not a serious basis to challenge the doctrine of necessity in the Third Circuit).

21.     The rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." In re

NY\1803495.2RLF1 3991728v. 2

Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Just For Feet, Inc., 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation . . ." is appropriate); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateauguay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 COLLIER ON BANKRUPTCY, 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

22.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization

NY\1803495.2RLF1 3991728v. 2

plan. See In re UNR Indus., 143 B.R. 516, 520 (Bankr. N.D. Ill. 1992) (permitting debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); Ionosphere Clubs, 98 B.R. at 167-77 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

23.     This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations. In In re Structurlite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated it "may exercise its equity powers under §105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'" Id. The court explained that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

C.     **It is Essential that the Debtor Is Able to Pay the Etesco Claim Immediately To Preserve the Value of the Estate**

24.     The relief sought by this Motion is appropriate under each of the foregoing standards. As set forth above, the Debtor has determined in the exercise of its sound business judgment that it is in the best interest of the estate to satisfy the requested portion of the Etesco Claim. To maximize the value of the Debtor's estate, the Debtor is attempting to avoid the risk of damage or theft to the Vessel or the loss of the Petrobras Charter (and the corresponding loss of 100% of its revenues) as a result of the termination of the Operating Agreement. As described above, payment of the requested portion of the Etesco Claim is essential to ensure the security

NY\1803495.2RLF1 3991728v. 2

and safety of the Vessel. Failure to make such payments will likely lead to the loss of the Debtor's sole asset, the Vessel, and accordingly the Debtor's only source of revenue.

25.     Most tellingly, the Prepetition Lenders support the Motion and indeed the Prepetition Security Trustee is the one who requested the payment. Because the Prepetition Lenders are materially undersecured, every dollar that is paid on a pre-petition claim is from the cash collateral of the Prepetition Lenders. But they understand that if Etesco abandons the Vessel, their recovery will be severely impaired in an amount that is many multiples of the requested payment, a result they are actively seeking to avoid by requesting the payment.

26.     Courts in this District and other jurisdictions have repeatedly recognized the importance of debtors making payments on account of prepetition obligations in order to prevent immediate and irreparable harm. Such relief is generally granted pursuant to critical vendor orders. See, e.g., In re Velocity Express Corp., No. 09-13294 (MFW) (Bankr. D. Del. Sept. 25, 2009) [Docket No. 30]; In re Premier International Holdings Inc. et al. (aka Six Flags, Inc.), No. 09-12019 (CCS) (Bankr. D. Del. July 14, 2009) [Docket No. 39]; In re RH Donnelley Corp, et al., No. 09-11833 (KG) (Bankr. D. Del. June 1, 2009) [Docket No. 39]; In re NPPI Holdings, Inc., No. 09-11547 (PJW) (Bankr. D. Del. May 7, 2009) [Docket No. 39]; In re Dayton Superior Corp., No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) [Docket No. 47]; In re Supplements LT Inc., et al. (f/k/a Leiner Health Products Inc., et al.), No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008) [Docket No. 27].

27.     The Debtor respectfully submits that the relief requested herein easily satisfies the above standards – the payment is necessary to maintain the safety and security of its sole asset in a foreign jurisdiction.

NY\1803495.2RLF1 3991728v. 2

**D.      Failure to Authorize the Debtor to Make Payments on Account of the Etesco Claim Will Cause Immediate and Irreparable Harm**

28.      Pursuant to the recently revised Rule 6003 of the Bankruptcy Rules, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.

29.      The Debtor's failure to pay the Etesco Claim plainly would result in immediate and irreparable harm. The termination[5] of the Operating Agreement (or if their wages are unpaid, the refusal of the employees of Etesco to staff the Vessel regardless of whether the Operating Agreement is terminated) would lead to, among other things, (i) the Vessel being unstaffed and vulnerable to attack, (ii) the violation of Brazilian law requiring the Vessel to be immediately docked, and (iii) the likely termination of the Petrobras Charter and the Petrobras Services Agreement, the sole source of revenue for the Debtor. The Debtor cannot survive if such events occur, and such events cannot be reversed. Further, the likely complete loss of the Vessel is the complete loss of the Prepetition Lenders' collateral. Because the Prepetition Lenders are materially undersecured, the loss of the Vessel would preclude any recovery by any other creditors of the Debtor.

30.      Accordingly, the Debtor submits it has satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of prepetition obligations related to the Etesco Claim.

**E.      The Consensual Use of Cash Collateral Should be Authorized**

31.      The Debtor believes that there is sufficient availability of funds in the form of cash collateral to satisfy the Etesco Claim immediately (the funds are held in an account located with the Prepetition Security Trustee). As set forth above, the Prepetition Lenders, the

---

[5] The Debtor does not concede that such termination is permissible.

NY\1803495.2RLF1 3991728v. 2

financial institutions holding such funds, not only have consented to the use of the cash collateral, they have requested that the Debtor make the payment. Moreover, they specifically acknowledge that the funds that will be used are their cash collateral and they consent to such use. The Debtor therefore requests it be permitted to consensually use cash collateral to pay the Etesco Claim.

## REQUEST FOR WAIVER OF STAY

32. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent irreparable damage to the Debtor's operations, value and ability to reorganize. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## DEBTOR'S RESERVATION OF RIGHTS

33. Nothing contained herein is intended to or should be construed as an admission of the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of the Operating Agreement or any other agreement or contract between the Debtor and Etesco under section 365 of the Bankruptcy Code. The Debtor expressly reserves its rights to contest any amounts claimed by Etesco under applicable non-bankruptcy law or to challenge as a violation of sections 362 and 365 any attempted termination by Etesco. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to and should not be construed as an

NY\1803495.2RLF1 3991728v.2

admission of the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## NOTICE

34.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Case.  The Debtor has provided notice of this Motion by facsimile or e-mail and overnight mail to:  (a) the United States Trustee for the District of Delaware; (b) the Debtor's twenty (20) largest unsecured creditors, as identified in its chapter 11 petition; (c) counsel to the Prepetition Security Trustee; and (d) all parties that have filed a request for notice under Bankruptcy Rule 2002.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice of this Motion is required.

## NO PRIOR REQUEST

35.     No prior motion for the relief requested herein has been made to this or any other court.

NY\1803495.2RLF1 3991728v. 2

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtor to make payments to Etesco; (b) authorizing the consensual use cash collateral to make such payments; and (c) granting such other and further relief as the Court may deem just and proper.

Dated: April 28, 2011
       Wilmington, Delaware

Respectfully submitted,

RICHARDS, LAYTON & FINGER, P.A.

_____
Russell C. Silberglied (No. 3462)
John H. Knight (No. 3848)
L. Katherine Good (No. 5101)
Marisa A. Terranova (No. 5396)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

LATHAM & WATKINS LLP
Keith A. Simon
Jude M. Gorman
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 212-906-1372
Facsimile: (212) 751-4864

Proposed Counsel to the
Debtor and Debtor-in-Possession

NY\1803495.2RLF1 3991728v. 2